FILED

05/21/2020

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs December 17, 2019

## STATE OF TENNESSEE v. BENJAMIN KEITH FRANKLIN

**Appeal from the Circuit Court for Rhea County**
**No. 2017-CR-26     Justin C. Angel, Judge**
_____

### No. E2019-01047-CCA-R3-CD
_____

The Defendant, Benjamin Keith Franklin, was convicted by the Rhea County Circuit Court jury of sexual battery by an authority figure, a Class C felony, and was sentenced to four years and six months in the Tennessee Department of Correction. On appeal, he argues that his conviction violates principles of double jeopardy and the evidence is insufficient to sustain his conviction. After review, we affirm the judgment of the trial court.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and Norma McGee OGLE, JJ., joined.

Larry G. Roddy, Dayton, Tennessee, for the appellant, Benjamin Keith Franklin.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Senior Assistant Attorney General; J. Michael Taylor, District Attorney General; and James W. Pope, III, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The Defendant was indicted for two counts of rape, one count of statutory rape by an authority figure, one count of aggravated statutory rape, one count of incest, and one count of sexual battery by an authority figure as a result of allegations of inappropriate sexual contact with his then sixteen-year-old daughter, the victim.

The victim testified that in January 2017, she lived with her father – the Defendant, her mother, and her brother in a house in Rhea County.  The Defendant had a disability for which he took Neurontin or gabapentin for back pain.  The Defendant sometimes gave her some of his pills to help with her own back pain.  The victim had gone to a doctor and had an x-ray, but that did not reveal any cause for her pain.

The victim testified that she went horseback riding on Saturday, January 21st, and was experiencing back pain.  She told the Defendant about her pain and, when they got home, he gave her one of his Neurontin pills.  He gave her a full pill instead of a half-pill like he usually gave her.  The pill made her feel dizzy, and she could not stand.  That night, she was laying on her bed in her room still feeling dizzy.  She was talking on the phone with a friend when the Defendant came into her room with an electric razor and told her to get off the phone.  The Defendant said to her "this is what he did with my mother," and then slid off her pants and started shaving her pubic hair.  The Defendant told her that incest was common in Germany and that it would "bring a relationship closer[.]"  He also told her that parents in countries overseas would perform sex acts with their children in order to teach them about sex and make a stronger family bond.  After the Defendant shaved her, he left her room without touching her anywhere else.

The victim testified that the Defendant came into her room again the next morning and gave her another whole Neurontin pill, as well as one of her mother's Percocet pills.  The two pills combined made it so that she could not stand up or move freely.  The Defendant came back into her room that evening and gave her yet another Neurontin pill.  The Defendant told her that he was going to perform a procedure to fix her back.  He tried to put the victim's mother's lacy bra on her and asked her to put on thong underwear also belonging to her mother.  When the victim refused to wear the thong, the Defendant undressed her completely.  He squeezed the victim's bare breasts, saying he was checking for breast cancer.  The victim could not "really do anything with the effects of the medication[.]"

The victim recalled that after squeezing her breasts, the Defendant moved her around and then she "felt his fingers in [her] backside."  The Defendant told her that he was checking her coccyx, which was something he did for her mother.  He told her that "some girls like it."  The Defendant then laid down in her bed and asked her to sleep with him.  She said that she "told him no, and it took everything [she] had to crawl into [her] Papasan chair and lay there for the night."  After asking her a second time, the Defendant left her room.  The victim reiterated that "[w]ith the medication, I couldn't move, I couldn't fight off anything."  The victim said that she was taking Prozac for anxiety and depression at the time of the incidents and that was also in her system.

The victim testified that she did not immediately tell her mother because she was scared of the Defendant. She elaborated that he had beat her with a belt before, beyond just a "whooping," and that her mother was likewise fearful of him. However, she told a friend at school the next day who told a school counselor. After speaking with the counselor herself, she told her mother the following day. The victim's mother confronted the Defendant and then took the victim and her brother out of the home. The victim went to the Children's Advocacy Center where she reported what had happened and they made a diagram detailing where on her body the Defendant touched her. They also conducted a physical examination.

David Hester, a pharmacist, testified that Neurontin is the brand name and gabapentin the generic for a medication prescribed for nerve pain. It raises the threshold for pain, and the main side-effects are drowsiness or dizziness. He said that Percocet is a combination of oxycodone, an opiate, and acetaminophen, and is used for moderate to severe pain. He said that Prozac is an anti-anxiety medication, and it can cause drowsiness.

Lisa Milam, a forensic social worker at Our Kids Center, met with the victim on February 14, 2017. She obtained a medical history from the victim in which the victim reported breast and genital touching, as well as anal penetration.

Heidi Dennis, a pediatric nurse practitioner at Our Kids Center, performed a physical examination of the victim. The exam revealed no evidence of trauma. However, Nurse Dennis stated that it would be very unlikely to find physical evidence of breast fondling, and physical evidence of anal penetration would be unlikely after 72 hours. Nurse Dennis said that she had never heard of a maneuver to check the coccyx bone for an injury by inserting a finger in the anus. She elaborated that the appropriate way to check for a broken bone was an x-ray and that any sort of physical manipulations could cause further damage.

The victim's mother and wife of the Defendant testified that around the timeframe of the incident, she had recently had a knee replacement and was taking Percocet for pain. She said that her and the Defendant's sexual relationship was "[n]onexistent" at the time and that she had rebuffed his advances that weekend. She stated that the Defendant had rubbed her back in the past but had never given her any sort of medical examination to check her coccyx bone, noting that he had a "combat life saver certificate" but did not have a medical degree. The victim's mother recalled that the victim told her that the Defendant had "touched [her] on the top" and "touched [her] on the bottom" the Tuesday after the incident, and she immediately confronted the Defendant. The Defendant denied the allegations, but the victim's mother contacted the authorities.

On cross-examination, the victim's mother surmised that the victim did not immediately report what the Defendant had done to her "because she was terrified. She [had] seen what he was capable of doing[,]" recalling that the victim had walked in on the Defendant "beating" her. The victim's mother admitted that at the time of trial she was living in Arkansas with a man named Brian who was also a veteran and had been a friend of the Defendant's while in the military. The victim's mother acknowledged that at the time of the incident, the victim's brother's bedroom was next to the victim's bedroom, but she noted that the victim's brother took medication for sleep that made it extremely difficult to wake him.

Officer Rocky Potter, an investigator with the Rhea County Sheriff's Department, testified that the Defendant voluntarily came in to give a statement on February 3, 2017. In his statement, the Defendant admitted to performing a procedure on the victim's back and checking her coccyx, which the Defendant described as "a little doggy tail shaped bone at the end of the vertebra." He said that to check the victim's coccyx, he placed his thumb at her anal opening and pushed, but she jumped in pain and he immediately stopped. The Defendant said that he may have accidentally touched the lower part of the victim's breasts along the rib cage when working on her back but denied grabbing her breasts.

Officer Chris Hall, another investigator with the Rhea County Sheriff's Department, served as a witness to the Defendant's statement.

The Defendant testified that he was a "100% disabled veteran" and recounted his military service and work history for the jury. Turning to the weekend of the alleged incidents, the Defendant claimed that on Saturday, he and the victim walked to some nearby abandoned house trailers and then rode back in his truck. They did not ride horses that day. He said that the victim's back was hurting throughout the day, so when they got home, he reluctantly agreed to "work on [her] back." He had worked on many people's backs before, including his wife's and children's, and the procedure he performed relieved pressure on the discs. He believed he knew a proper procedure for manipulating back muscles from his first responder training and combat life-saving course that taught anatomy. He was familiar with the coccyx bone because he had broken his before by jumping off a roof onto his children's trampoline. The Defendant admitted to giving the victim one of his Neurontin pills that Saturday. He then clarified that he actually gave her three Neurontin pills on Saturday but not to be taken all at once. He did not give her Percocet.

The Defendant recalled that he performed the procedure in the victim's bedroom so she could immediately go to sleep. He said that the door to her bedroom was never closed, there was a motion-sensor light right outside her door, and the victim's brother passed by her room several times walking to and from the bathroom. The victim was wearing a sports

bra, underwear, and shorts. She never took off her clothes, nor did he remove her clothing. However, when he examined the victim's coccyx bone, her shorts "were pulled down just far enough to expose the end of the spinal area." He touched her tailbone and "[s]he lurched forward" and said "[o]w," so he stopped. He said that no portion of his finger went inside the victim's body. The Defendant stated that he did not grab the victim's breasts, but that the "tops of [his] fingers" might have accidentally "brushed the bottom of her breast area" during the procedure. The Defendant denied asking the victim to sleep with him afterwards, claiming that the victim asked if he wanted to sleep in her bed because she was going to sleep in her Papasan chair.

The Defendant denied shaving the victim's private area with an electric razor as she described. He owned "about 20 electric razors" but had bought the victim her own set of razors so she would not use his, which he walked in and handed to her. The Defendant said that he did not work on the victim's back at all on Sunday. He claimed that he only discussed incest with the victim in the context of a paper the victim was writing about South American cultures. He said that he had never been arrested and had never beat his wife. He did not ask the victim to put on her mother's lacy underwear. He hypothesized that the victim was motivated to tell lies about him because of the victim's mother's extramarital relationship with the Defendant's friend. The Defendant stated that he voluntarily went to the sheriff's department and made a statement because he wanted to "go ahead and clear it up." He was allowed to leave after giving the statement.

On cross-examination, the Defendant admitted that he referred to the shorts the victim was wearing when he performed the procedure as "those damn booty shorts" because they were extremely short. He then elaborated that he had her change because the shorts were inappropriate, and he stood in the corner and faced the wall while she did so. He admitted to running his finger down the victim's tailbone between her cheeks just above the anal opening to check her coccyx, despite her having a recent x-ray that showed no fractures. The Defendant continued to deny shaving the victim's private area but admitted to shaving the victim's mother's private area many times. Lastly, contrary to the victim's mother's characterization of her and the Defendant's sexual relationship as "nonexistent," the Defendant said that they had sex twice on the Sunday the weekend of the alleged incidents, and he had refused her advances during the week leading up to that day.

Following the conclusion of the proof, the jury convicted the Defendant of sexual battery by an authority figure and found him not guilty on the other charges.

## ANALYSIS

### I. Double Jeopardy

The Defendant argues that his conviction for sexual battery by an authority figure violates principles of double jeopardy because the jury found him not guilty of that offense as a lesser-included offense of the rape charges and "[t]he alleged offenses in all 6 counts of the indictment occurred on the same date, to the same victim and based on the same facts."

The Double Jeopardy Clause of the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb[.]" U.S. Const. amend. V. Similarly, Article I, section 10 of the Tennessee Constitution provides "[t]hat no person shall, for the same offence, be twice put in jeopardy of life or limb." Our supreme court has recognized that the Double Jeopardy Clause provides three separate protections: (1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense. State v. Watkins, 362 S.W.3d 530, 541 (Tenn. 2012).

The Defendant's conviction for sexual battery by an authority figure does not violate any of the aforementioned protections provided by the Double Jeopardy Clause. He was not prosecuted for sexual battery by an authority figure after being acquitted of the offense; he was not prosecuted for sexual battery by an authority figure a second time after being convicted of the offense; and he was not punished multiple times for the same offense. The Defendant simply cannot show that he was punished twice for the same conduct. The Defendant's argument could more appropriately be coined as a complaint about inconsistent jury verdicts. However, inconsistent jury verdicts are not a basis for relief. See State v. Davis, 466 S.W.3d 49, 77 (Tenn. 2015). Moreover, contrary to the Defendant's assertion that all the charges were based on the same facts, in its closing argument, the State pointed out that the various rape and incest charges were based on the Defendant's "putting his finger in her rear," and the sexual battery by an authority figure charge was based on "the hands to the breasts." Therefore, the Defendant was found not guilty of a touching regarding one part of the victim's body and guilty of a touching regarding *another* part of the victim's body. The Defendant is not entitled to relief.

## II. Sufficiency

The Defendant also challenges the sufficiency of the convicting evidence. He provides no argument for this assertion other than that "no rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt."

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the

prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, the inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)).

Relevant here, sexual battery by an authority figure is the "unlawful sexual contact with a victim by the defendant . . . [when] . . . [t]he victim was, at the time of the offense, thirteen (13) years of age or older but less than eighteen (18) years of age [and][t]he defendant had, at the time of the offense, parental or custodial authority over the victim and used such authority to accomplish the sexual contact." Tenn. Code Ann. § 39-13-527(a)(1)(B). "'Sexual contact' includes the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that touching can be reasonably construed as being for the purpose of sexual arousal or gratification." See id. § 39-13-501(6). "'Intimate parts' includes . . . the primary genital area, groin, inner thigh, buttock or breast of a human being." Id. § 39-13-501(2).

In its closing argument, the State elected the allegation of the Defendant's grabbing the victim's breasts for the charge of sexual battery by an authority figure. In the light most favorable to the State, the evidence shows that the night before the touching, the Defendant shaved the victim's pubic hair and talked about how parents in countries overseas performed sex acts with their children in order to teach them about sex and make a stronger family bond. The next day, after giving her two Neurontin pills and a Percocet, the Defendant tried to put the victim's mother's lacy bra on the victim and asked her to put on thong underwear also belonging to her mother. When the victim refused to wear the thong, the Defendant undressed her completely. The Defendant then squeezed the victim's bare breasts, claiming he was checking for breast cancer. The victim was sixteen-years-old at the time of the incident, and she testified that she did not immediately tell her mother because she was scared of the Defendant. From this proof, we conclude that a rational trier of fact could find that the Defendant intentionally touched the victim's intimate parts in a manner that could reasonably be construed as being for the purpose of sexual arousal or gratification and that he used his parental authority over the victim to accomplish the sexual contact.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE